## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## (RICHMOND DIVISION)

| | | |
|---|---|---|
| Ben H. Droste and Calvin Cash, Individually and as Class Representatives, | : : : | |
| Plaintiffs, | : : | |
| v. | : : : | Civil Action No. 3:14-cv-00467 |
| Vert Capital Corp., Wolff-Fording Holdings, Inc., and Wolff-Fording & Co., | : : : | |
| Defendants. | : : : | |

## SECOND AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATION OF THE WORKER ADJUSTMENT AND RETRAINING
## NOTIFICATION ACT 29 U.S.C. § 2101, *et seq.*

Plaintiffs, Ben H. Droste and Calvin Cash ("Plaintiffs" or "Class Plaintiffs"), allege on behalf of themselves and two classes of similarly-situated former employees of defendants, Vert Capital Corp. ("Vert"), Wolff-Fording Holdings, Inc. ("Wolff-Fording Holdings"), and Wolff-Fording & Co. ("Wolff-Fording") (collectively referred to as "Defendants"), by and through their undersigned counsel, as follows:

### NATURE OF THE ACTION AND THE PARTIES

1.      Vert is a Los Angeles-based private equity firm incorporated in the state of Delaware, with its principal place of business at 10951 West Pico Boulevard, Los Angeles, California 90064.   Among other things, Vert directly or indirectly through its affiliated companies acquires failing companies and thereafter develops operating plans and assumes day-to-day operating responsibilities over those companies.

2.      On June 2, 2014, Vert incorporated Wolff-Fording Holdings in Delaware and, upon information and belief, owns 100% of that entity.   Also upon information and belief,

Wolff-Fording Holdings is funded entirely by Vert, and, as more specifically stated below, has directors/officers on its Board who were appointed by Vert and who also sat on Vert's Board simultaneously. Upon information and belief, Wolff-Fording Holdings' principal place of business is located at 10951 West Pico Boulevard, Los Angeles, California, where it shares offices, employees, and equipment with Vert. Vert and Wolff-Fording Holdings hereinafter will be collectively referred to as the "Vert Defendants."

3.      Wolff-Fording is a Virginia corporation whose principal place of business is located at 2220 East Main Street, Richmond, Virginia ("Richmond Plant").

4.      In early June 2014, the Vert Defendants purchased a controlling interest in Wolff-Fording.

5.      At the time, Wolff-Fording employed approximately 125-150 individuals and manufactured and sold hundreds of thousands of dance costumes a year to its tens of thousands of customers.

6.      Also at that time, the Vert Defendants, as a single employer with Wolff-Fording, assumed complete responsibility for Wolff-Fording's continued viability by, among other things: (a) assuming day-to-day operating responsibilities of Wolff-Fording; (b) maintaining direct oversight and control over Wolff-Fordings' strategic, financial, personnel, and benefits functions; (c) exercising control over Wolff-Fording's business plans (including those concerning the day-to-day operation of the business); and (d) making decisions on whether or not to: (i) extend financing or otherwise fund Wolff-Fording; (ii) pay wages, vacation, and benefits due employees; (iii) furlough/layoff employees; and (iv) cease operations of the company.

7.      To be clear, the Vert Defendants, as a single employer with Wolff-Fording, made the precise decision from which this cause of action stems - to terminate about 67 employees on

or about June 10, 2014, and at least 50 employees on or about June 23, 2014, without providing any notice required under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq.* (the "WARN Act"), and without adequately compensating those employees, with the intent to evade their obligations under that Act.

8.    Plaintiff, Calvin Cash, who had reported to the Richmond Plant and worked in the retail store since 1986, was one of the employees terminated on June 10, 2014.

9.    Plaintiff, Ben Droste, who had been Controller at the Richmond Plant since June 2013, was terminated on June 23, 2014.

10.    The terminations on or about June 10, 2014, and on or about June 23, 2014, shall hereinafter be collectively referred to as the "Terminations."

11.    The Terminations were part of the mass layoffs/plant closings and termination of the business operations at the Richmond Plant orchestrated by the Vert Defendants, as a single employer with Wolff-Fording.

12.    Plaintiffs collectively bring this action on behalf of themselves, and other similarly-situated former employees who worked for Defendants, as a single employer with each other, and were terminated without cause, as part of, or as the result of, the mass layoffs/plant closings/termination of operations ordered by the Vert Defendants, which occurred on or about June 10, 2014, and on or about June 23, 2014, and who were not provided sufficient written notice of their terminations by Defendants or adequate compensation, as required by the WARN Act.

13.    Plaintiffs and all similarly-situated employees seek to recover 60 days' wages and benefits, pursuant to the WARN Act, from Defendants.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367 and 29 U.S.C. § 2104(a)(5).

15.     Venue is proper in this District pursuant to 29 U.S.C. § 2104(a)(5).

## FACTS

16.     In 1984, two brothers, Stuart and Jeffrey Feldstein (collectively referred to as the "Feldsteins"), took over 100% ownership of Wolff-Fording from their parents. Stuart Feldstein was the President and Jeffrey Feldstein was the Vice-President.

17.     For the past several years prior to June of 2014, Wolff-Fording had been struggling financially. Among other things, it was not making rent payments to the landlord of the Richmond Plant and the Feldsteins had to inject significant amounts of capital to keep the company afloat.

18.     On June 30, 2013, the end of Wolff-Fording's fiscal year, Wolff-Fording's banker, Village Bank, became very concerned about the continuing losses the business was experiencing. Wolff-Fording had a $2.5 million line of credit, which was secured with a number of items.

19.     In August or September 2013, a consultant, Jim Raper, was hired to provide financial and operations consultation to the Feldsteins. Mr. Raper did business under the name of Crimson Advisors. Beginning in September and October 2013, Mr. Raper interviewed a number of employees to that end and prepared a 50-page report. The report went to Village Bank and to the Feldsteins and, upon information and belief, was not shared with any other Wolff-Fording employees.

20.     In approximately January 2014, Village Bank made it known that it was going to either reduce the line of credit it had been providing to Wolff-Fording or cut it off, of which the line of credit at the time was about $2.0 million.

21.     Shortly thereafter, Village Bank advised Wolff-Fording that it would not continue the line of credit.   Ultimately, Stuart Feldstein paid off the remaining balance using his own funds.

22.     In or about April or May 2014, Mr. Raper introduced the Feldsteins to Vert.

23.     At that time, two Directors of Vert – Michael Pope and Richard Shuster – met with several executives of Wolff-Fording and toured the Richmond Plant.  Also, Mr. Pope and Mr. Shuster asked for a set of financials (Balance Sheets and Income Statements) on Wolff-Fording covering February 2012 through March 2014.

24.     Mr. Droste, as the Controller for Wolff-Fording, provided the financial statements to Mr. Pope and Mr. Shuster that they requested.

25.     In early June 2014, the Vert Defendants purchased a controlling interest in Wolff-Fording and placed a lien on all of Wolff-Fording's property.

26.     Thereafter, the Vert Defendants acted as a single employer with Wolff-Fording. As more specifically explained below:

    A.     Defendants shared common ownership;

    B.     Defendants shared common officers and directors;

    C.     The Vert Defendants exercised *de facto* control over the labor practices governing the Plaintiffs and Class Members, including the decision to order the mass layoffs or plant closings at the Richmond Plant;

D.      There was a unity of personnel policies emanating from a common source between the Vert Defendants and Wolff-Fording; and

E.      There was a dependency of operations between Wolff-Fording and the Vert Defendants.

27.      Immediately upon purchasing Wolff-Fording, the Vert Defendants took over the day-to-day operations of Wolff-Fording, developed and implemented operating plans for Wolff-Fording, directly communicated and gave directions to the employees, and made pivotal personnel decisions for that company.

28.      Vert appointed three of its Directors – Mr. Shuster, Mr. Pope, and Adam Levin - to the Board of Directors of Wolff-Fording Holdings.

29.      Also, the Vert Defendants appointed Mr. Shuster to serve as CEO of Wolff-Fording.  Accordingly, Mr. Shuster served as Director for all three Defendants simultaneously.

30.      In addition, Mr. Levin and Mr. Pope simultaneously served as Directors of both Vert and Wolff-Fording Holdings at all pertinent times hereto and took responsibility, with Mr. Shuster, over the day-to-day operations of Wolff-Fording.

31.      On June 6, 2014, Mr. Shuster, Mr. Pope, and Mr. Levin met with managers of Wolff-Fording, including plaintiff, Mr. Droste, and told those managers that they were committed to turning Wolff-Fording around.

32.      Mr. Shuster, Mr. Pope, and Mr. Levin will hereinafter be referred to as the "Vert Directors" and Plaintiffs hereinafter intend to allege that, unless otherwise specified, the Vert Directors were, at all times, acting on behalf of and at the direction of the Vert Defendants.

33.      Further, the Vert Directors met with employees on June 9, 2014, during which meeting they told employees that Vert was "partnering" with Wolff-Fording and that they had a

"controlling ownership interest" in Wolff-Fording.  They boasted about how they would work with the employees and make the company better "for everyone."

34.     On that same day, the Vert Directors also met with, among others, Jeffrey Feldstein and Mr. Droste, during which meeting one of the Vert Directors expressed a desire to delay the publication of the Wolff-Fording product catalogs.

35.     Upon information and belief, the Vert Directors expressed this desire concerning the catalog because they did not plan to produce a catalog at all and did not plan to continue manufacturing operations at the plant.

36.     In fact, the catalog never has been printed, despite Jeffrey Feldstein's objections.

37.     Also, on more than one occasion, some or all of the Vert Directors mentioned to the employees that they were contemplating moving the manufacturing operations overseas.

38.     Moreover, at 6 p.m. on June 9, 2014, the Vert Defendants informed Jeffrey Feldstein that the Vert Defendants had made the decision to lay off about 67 people at the Richmond Plant the next day.  Stuart Feldstein was in Israel for a wedding at the time and was informed of this decision by telephone.

39.     The next day, on June 10, 2014, Vert informed Mr. Droste that 67 people were being terminated.  Upon information and belief, the Vert Defendants (not the Feldsteins or any other Wolff-Fording employee/executive) made the decision to lay off these people.

40.     The Vert Directors called employees into the cafeteria close to 4 p.m. that afternoon and told them they were being terminated.  Ms. Cash was one of those employees who was terminated.

41.     Neither Ms. Cash nor any of the other employees had been given any prior notice of their terminations and had not been told when they would be paid.

42.     Shortly after the June 10, 2014 terminations, Mr. Shuster instructed Mr. Droste to pay the terminated employees on Friday, June 20, 2014 (which was not a regular pay day) for the two days worked (June 9-10) immediately before their discharges and any accrued vacation (one week or 2 weeks based on tenure).

43.     Because Mr. Droste learned that there were insufficient funds in the Wolff-Fording account to pay the employees, Mr. Droste objected to issuing the checks to them.

44.     Mr. Shuster informed Mr. Droste that Vert was wiring the funds into Wolff-Fording's account and asked Mr. Pope to wire $120,000 to Wolff-Fording for payroll and the health insurance premium (about $50,000 outstanding for June).

45.     On June 19, 2014, Mr. Shuster instructed Lisa Taylor, a former employee of Defendants in the payroll department, to prepare manual checks for these amounts.

46.     As of June 19, 2014, however, Mr. Droste confirmed that no wire transfer had been received.

47.     On the morning of June 20, 2014, approximately 20 former employees came to Wolff-Fording to receive their pay checks.  Neither Mr. Droste (the Controller) nor Stuart Feldstein (who was present at the time and a purported owner, albeit minority owner) of Wolff-Fording could provide their paychecks nor could they answer their questions about when they would be receiving their checks.  This is because neither Mr. Droste nor Stuart Feldstein had any control over Wolff-Fording's ability or the decisions whether to issue these checks; only the Vert Directors had this control.

48.     Mr. Shuster arrived at approximately 10 a.m. and told the discharged employees to come back around 4 p.m. that day.  Mr. Levin and Mr. Pope also came to Wolff-Fording around that time and Mr. Levin represented that funds had been wired.

49.     Again, no funds had been wired.   Instead, a Vert Director made yet another promise: Mr. Shuster promised Mr. Droste that Mr. Shuster would ensure that Vert would wire the necessary funds.

50.     Doing as they were told and hoping to finally receive the pay that they had earned before they had been summarily discharged by the Vert Defendants, former employees came back to the Richmond Plant later that day and began waiting in the lobby to collect their checks. Nevertheless, Vert still had not funded the payroll account.

51.     Out of concern for the terminated employees and because he did not want the company's checks to bounce, Mr. Droste went to Jeffrey Feldstein's office and informed Jeffrey Feldstein, Stuart Feldstein, and the Vert Directors that no funds had been wired yet, that people were congregating again in the lobby, and that there were insufficient funds to pay them.   Mr. Levin directly instructed Mr. Droste to issue the paychecks, assuring him that the necessary funds would be in the account.   Relying on that assurance, Mr. Droste and Ms. Taylor distributed checks to the employees who were waiting.

52.     Shortly thereafter, Mr. Levin verbally attacked Mr. Droste.   He went into Mr. Droste's office, slammed the door and yelled, "Do you know who you work for?!"   When Mr. Droste replied, "For Vert and Wolff-Fording," Mr. Levin shouted, "You work for me.   I own you!"   Mr. Levin then proclaimed that Mr. Droste reported to him and to Mr. Shuster.   Mr. Levin threatened Mr. Droste by running his finger across his throat and telling him, "What happened back there [in Jeff's office] was totally unacceptable.   That will never happen again."

53.     Just as Mr. Droste had feared, many of the checks that had been given to the 67 employees who had been terminated on June 10, 2014, bounced.

54.     These checks bounced because the Vert Defendants failed to fund the payroll account despite the many assurances from the Vert Directors that this would be done.  Indeed, the Vert Defendants so controlled Wolff-Fording that, when the Vert Defendants did not fund the payroll, Wolff-Fording could not compensate its employees.

55.     After laying off 67 employees, the Vert Defendants continued to control Wolff-Fording.

56.     On June 11, 2014, Mr. Pope sent Mr. Droste an email introducing him to Sheri Lofgren, a consultant Vert hired on a contract basis to provide support to Wolff-Fording's accounting, purchasing, IT, shipping, and customer service departments, and to prepare a complete financial report with analysis for Vert.

57.     Mr. Pope directly instructed Mr. Droste to provide Ms. Lofgren with any assistance and information she needed.  Mr. Pope also directed Mr. Droste to provide Ms. Lofgren with direction in meeting with the staff and obtaining access to the company information.  Mr. Pope signed the email, "Michael Pope Vert Capital Corp."

58.     A few days later, Mr. Shuster sent a letter to the remaining employees, including Mr. Droste, explaining that he would be relocating to Richmond as the CEO of Wolff-Fording and that he "look[ed] forward to working with each of [the employees] to rebuild and grow Wolff-Fording for years to come."

59.     Instead of working with the employees to rebuild and grow Wolff-Fording "for years to come," however, on June 21, 2014, Vert terminated Stuart and Jeffrey Feldstein and, on June 23, 2014, Mr. Shuster met with Mr. Droste and the remaining employees (the "June 23 Meeting") and told all but four of them that they were being terminated.

60.     On that day, Vert provided Mr. Shuster with a letter Vert wrote for Mr. Shuster's use when terminating the employees.

61.     Once Mr. Shuster received the letter from Vert, Mr. Shuster instructed Ms. Taylor to fill in each employee's name on each respective letter and to deliver them by hand to those who had been terminated that day, totaling at least 50 employees, and by mail to those people who had been terminated on June 10, 2014.

62.     A true and correct copy of the letter that may have been delivered to some or all of the employees who were terminated on June 10, 2014 is attached hereto as "Exhibit A," and a true and correct copy of the letter that may have been delivered to some or all of the employees terminated on June 23, 2014, is attached hereto as "Exhibit B."

63.     Neither of these letters constitute adequate or timely notice under the WARN Act such that Defendants could be relieved from liability under the WARN Act based on one of its exceptions, including the unforeseen business circumstances exception or the faltering company exception.

64.     At the June 23 meeting, Mr. Shuster made more promises he knew neither he nor the Vert Defendants would keep; he promised employees that they would be paid their unused accrued vacation time and for all of the time they had worked.

65.     Nevertheless, the Vert Defendants caused Wolff-Fording to not make those payments.  They simply had not provided the money to pay the employees.

66.     Accordingly, many employees, including Mr. Droste, filed complaints with the Virginia Department of Labor and Industry ("Va DOL") for wages they had earned prior to being terminated.

67.     Upon information and belief, as a result of pressure that the Va. DOL put on the Vert Defendants, in August, 2014, the Vert Defendants caused certain employees to be paid wages for the last days of their employment.

68.     The checks were drawn on Wolff-Fording Holdings' account and were mailed out of its and Vert's shared offices located at 10951 West Pico Boulevard, Los Angeles, California.

69.     A true and correct copy of an example of such a check, which was mailed to Mr. Droste, is attached hereto as "Exhibit C."

70.     By early July 2014, after the damage had been done at Wolff-Fording, Mr. Shuster returned to the Vert Defendant's Los Angeles office.

71.     On August 7, 2014, the Vert Defendants posted an advertisement on the internet seeking applications for the position of Business Operations Manager "at the [Wolff-Fording] Virginia Warehouse location."

72.     The advertisement stated that the Business Operations Manager "will collaborate with the Los Angeles Branch of the Parent Company to manage all aspects of the business operations for the company."

73.     Upon information and belief, the "Parent Company" to which this advertisement refers is Vert.

74.     In addition, on September 9, 2014 and then again on September 12, 2014, Shane Vultee, a self-described employee of Vert responsible for business development and marketing, contacted Anita Hicks to ask questions concerning Wolff-Fording's information technology. Ms. Hicks worked for Wolff-Fording for over 32 years before she was terminated by the Vert Defendants, as single employer with Wolff-Fording, in June 2014.

75.     Mr. Vultee represented that Vert needed information on Wolff-Fording's server to integrate it into Vert's website.

76.     Understandably, Ms. Hicks did not assist Mr. Vultee or the Vert Defendants.

77.     Finally, it is also notable that, when Plaintiffs instituted this action against Vert and Wolff-Fording, the defendants hired the same attorneys to represent them both, presumably because there was no conflict between them.  Prior to the filing of the instant Second Amended Complaint, Wolff-Fording Holdings had not been named.

## WARN ACT AND CLASS ACTION ALLEGATIONS

78.     The Plaintiffs, on behalf of themselves and other persons similarly situated, repeat and re-allege the allegations of the preceding paragraphs as if fully restated herein.

79.     Plaintiffs bring their claim for relief for violation of 29 U.S.C. § 2101 *et seq.*, on behalf of themselves and on behalf of all other similarly-situated former employees pursuant to 29 U.S.C. § 2104(a)(5) and Federal Rules of Civil Procedure, Rule 23(a), who belong to one of the two following subclasses:

(a)     The "June 10 WARN Subclass," which consists of all those who worked at or reported to the Richmond Plant and who were terminated and/or laid off without cause on their part from their employment on or within thirty (30) days of June 10, 2014, as part of, or as the reasonably foreseeable consequence of the mass layoff/plant closing ordered by Defendants, which occurred on June 10, 2014, and who did not receive proper and timely notice of said mass layoff/plant closing as required by the WARN Act, and who do not file a timely request to opt out of the class;

(b)     The "June 23 WARN Subclass," which consists of all those who worked at or reported to the Richmond Plant and who were terminated and/or laid off without cause on

their part from their employment on or within thirty (30) days of June 23, 2014, or thereafter, as part or, or as the reasonably foreseeable consequence of the mass layoff/plant closing ordered by Defendants, which occurred on June 23, 2014, and who did not receive proper and timely notice of said mass layoff/plant closing as required by the WARN Act, and who do not file a timely request to opt out of the class.

80.     The persons in the June 10 WARN Subclass ("June 10 WARN Subclass Members") and the June 23 WARN Subclass ("June 23 WARN Subclass Members") identified above each are so numerous that joinder of all members is impracticable.  Upon information and belief, the Plaintiffs believe that the June 10 WARN Subclass consists of at least 67 employees and the June 23 WARN Subclass consists of at least 50 employees.  Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.  The June 10 WARN Subclass Members and the June 23 WARN Subclass Members will hereinafter, when appropriate, be referred to as the WARN Subclass Members.

81.     On information and belief, the identity of the WARN Subclass Members and the recent residential address of each of the WARN Subclass Members is contained in the books and records of Defendants.

82.     On information and belief, the rate of pay and benefits that were being paid by Defendants to each WARN Subclass Member at the time of his/her termination is contained in the books and records of Defendants.

83.     Common questions of law and fact exist as to members of the June 10 WARN Subclass Members, including, but not limited to, the following:

(a)     Whether the June 10 WARN Subclass Members were employees of the Defendants who worked at or reported to the Richmond Plant;

(b)     Whether each of the Defendants, as a single employer, were covered "employers" under the WARN Act with respect to the June 10 WARN Subclass Members;

(c)     Whether Defendants, acting as a single employer, unlawfully terminated the employment of the June 10 WARN Subclass Members without cause on their part and without giving them sufficient written notice in violation of the WARN Act;

(d)     Whether Defendants, acting as a single employer, unlawfully failed to pay the June 10 WARN Subclass Members all wages and benefits due under the WARN Act; and

(e)     Whether an exception to the WARN Act applies.

84.     Common questions of law and fact exist as to members of the June 23 WARN Subclass Members, including, but not limited to, the following:

(a)     Whether the June 23 WARN Subclass Members were employees of the Defendants who worked at or reported to the Richmond Plant;

(b)     Whether each of the Defendants, as a single employer, were covered "employers" under the WARN Act with respect to the June 23 WARN Subclass Members;

(c)     Whether Defendants, acting as a single employer, unlawfully terminated the employment of the June 23 WARN Subclass Members without cause on their part and without giving them sufficient written notice in violation of the WARN Act;

(d)     Whether Defendants, acting as a single employer, unlawfully failed to pay the June 23 WARN Subclass Members all wages and benefits due under the WARN Act; and

(e)     Whether an exception to the WARN Act applies.

85.     Plaintiff Calvin Cash's claims are typical of the June 10 WARN Subclass Members in that she, like the other June 10 WARN Subclass Members, worked at or reported to the Richmond Plant and was terminated and/or laid off without cause on her part from her employment on or within thirty (30) days of June 10, 2014, as part of, or as the reasonably foreseeable consequence of the mass layoff/plant closing ordered by Defendants on June 10, 2014, and did not receive proper and timely notice of said mass layoff/plant closing as required by the WARN Act.

86.     Plaintiff Ben Droste's claims are typical of the June 23 WARN Subclass because, he, like other June 23 WARN Subclass Members, worked at or reported to the Richmond Plant and was terminated and/or laid off without cause on his part from his employment on or within thirty (30) days of June 23, 2014, as part of, or as the reasonably foreseeable consequence of the mass layoff/plant closing ordered by Defendants on June 23, 2014, and did not receive proper and timely notice of said mass layoff/plant closing as required by the WARN Act.

87.     The Plaintiffs collectively will fairly and adequately protect the interests of the WARN Subclass. The WARN Subclass Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

88.     The Defendants terminated the Plaintiffs' employment as part of mass layoffs/plant closings as defined by 29 U.S.C. § 2101(a)(2), (3), for which they were entitled to, but did not, receive 60 days advance written notice under the WARN Act.

89.     Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to each of the WARN Subclasses predominate over any questions affecting only individual members of the WARN Subclasses, and because a class action is superior to other available methods for the fair and efficient adjudication of this

litigation — particularly in the context of WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant, and damages suffered by individual WARN Subclass Members are small compared to the expense and burden of individual prosecution of this litigation.

90.     Concentrating all the potential litigation concerning the WARN Act rights of the WARN Subclass Members in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the WARN Act rights of all the members of the WARN Subclasses.

91.     Plaintiffs intend to send notice to all members of the WARN Subclasses to the extent required by Rule 23.

## CLAIMS FOR RELIEF

92.     Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

93.     At all relevant times, Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

94.     At all times relevant, each Defendant was an "employer" as that term is defined in 29 U.S.C. § 2101(a)(1) and 20 C.F.R. § 639.3(a).

95.     Specifically, the Vert Defendants, with Wolff-Fording, constituted a "single employer" of the Plaintiffs and the WARN Sublass Members under the WARN Act in that, among other things:

A.     Defendants shared common ownership;

B.      Defendants shared common officers and directors;

C.      The Vert Defendants exercised *de facto* control over the labor practices governing the Plaintiffs and WARN Subclass Members, including the decision to order the mass layoffs or plant closings at the Richmond Plant;

D.      There was a unity of personnel policies emanating from a common source between the Vert Defendants and Wolff-Fording; and

E.      There was a dependency of operations between Wolff-Fording and the Vert Defendants.

96.     The Vert Defendants, as a single employer with Wolff-Fording, ordered and arranged for plant closings/mass layoffs, as those terms are defined by 29 U.S.C. § 2101(a)(2).

97.     The plant closings/mass layoffs at the Richmond Plant each resulted in "employment losses," as that term is defined by 29 U.S.C. § 2101(a)(2) for at least fifty of Defendants' employees as well as thirty-three percent (33%) of Defendants' workforce at the employment site, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2101(a)(8), and at least 50 employees (again excluding any part-time employees) on each occasion experienced an "employment loss" at a single site of employment.

98.     The Plaintiffs and the WARN Subclass Members were terminated by the Vert Defendants (as a single employer with Wolff-Fording) without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs/plant closings ordered by them.

99.     The Plaintiffs and the WARN Subclass Members are "affected employees" of Defendants as their single employer within the meaning of 29 U.S.C. § 2101(a)(5).

100.    Defendants were required by the WARN Act to give the Plaintiffs and the WARN Subclass Members at least 60 days' advance written notice of their terminations.

101.    Defendants failed to give the Plaintiffs and the WARN Subclass members written notice that complied with the requirements of the WARN Act.

102.    The Plaintiffs, and each of the WARN Subclass Members, are "aggrieved employees" of the Defendants as that term is defined in 29 U.S.C. § 2104 (a)(7).

103.    Defendants failed to pay the Plaintiffs and each of the WARN Subclass Members their respective wages, salary, commissions, bonuses, and benefits for 60 days following their respective terminations.

WHEREFORE, the Plaintiffs, individually and on behalf of all other similarly-situated persons, pray for the following relief as against Defendants, jointly and severally:

A.    Certification of this action as a Class Action;

B.    Designation of the Plaintiffs as the Class Representatives;

C.    Appointment of the undersigned attorneys as Class Counsel;

D.    Judgment finding that Defendants' conduct was a violation of the WARN Act, 29 U.S.C. § 2101 *et seq.*;

E.    Award of Damages in favor of each named Plaintiff and each Other Similarly Situated Individual, equal to 60 days' wages and benefits, pursuant to the WARN Act;

F.    All interest, including prejudgment interest, as allowed by law on the amounts owed under the preceding paragraphs;

G.    Reasonable attorneys' fees and costs; and

H.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Trial by jury is demanded on all issues triable by jury.

BEN H. DROSTE and CALVIN CASH,
Individually and as Class Representatives

Dated:  October 3, 2014      By:     _/s/  C. Michael DeCamps_
C. Michael DeCamps (VSB No. 15066)
SANDS ANDERSON PC
Bank of America Center
1111 East Main Street, Suite 2400
Richmond, VA  23219-3500
Phone:  (804) 783-7297
E-Mail:  mdecamps@sandsanderson.com
*Attorney for Plaintiffs*

Charles A. Ercole (PA Bar No. 69192)*
Lee D. Moylan (PA Bar No. 80915)*
KLEHR HARRISON HARVEY
BRANZBURG, LLP
1835 Market Street, 14th Floor
Philadelphia, PA  19103
Phone:  (215) 569-2700
E-Mail:  cercole@klehr.com
E-Mail:  lmoylan@klehr.com
*Attorneys for Plaintiffs*
*Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2014, I caused a true and correct copy of Plaintiffs'

Second Amended Class Action Complaint for Violation of the Worker Adjustment and

Retraining Notification Act 29 U.S.C. § 2101, et seq. to be served on the following counsel of

record via the ECF system.

Alison D. Hurt
LeClairRyan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street, Eighth Floor
Richmond, VA  23219; and

John M. Barr
Law Office of John M. Barr, P.C.
4105 Stuart Avenue
Richmond, VA 23221

*Counsel for Vert Capital Corporation*
*and Wolff-Fording & Company.*

_/s/   C. Michael DeCamps_